IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

KAREN STROBLES,

     Plaintiff,

v.                               CASE NO. 1:04-cv-00100-SPM-AK

TOWN OF MICANOPY,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Doc. 19, Motion for Summary Judgment, by Town Of Micanopy.  The Court gave Plaintiff the requisite *Brown/Griffith* notice, Doc. 23, and she has filed a response.  Doc. 24.  This cause is therefore in a posture for decision.  Having carefully considered the matter, the Court recommends that the motion for summary judgment be granted, and this cause be dismissed with prejudice.

## BACKGROUND[1]

Plaintiff Karen Strobles, an African-American female, was hired as the Deputy Town Clerk for the Town of Micanopy on August 22, 1994.  Doc. 1[2]; Doc. 20, Ex. A.  At that time, the

---

[1]The facts and all reasonable inferences therefrom will, of course, be taken in the light most favorable to Plaintiff, as the non-moving party.  *Evans v. Shephens*, 407 F.3d 1272, 128 (11th Cir. 2005).

[2]The complaint in this case is verified, i.e., Ms. Strobles "affirmed under penalty of perjury that the foregoing document is true and correct to the best of my personal knowledge, information and belief."  Doc. 1.  It may, therefore, be treated as an affidavit for purposes of Fed.

Town Clerk/Administrator was Martha Weaver.

On July 10, 2001, Commissioners approved an education reimbursement program which provided full-time employees with 100 percent tuition reimbursement for courses taken that were related to their current job duties.  Doc. 20, Ex. B.  Ms. Strobles presented the underlying proposal to the Commission, and though the program was open to all full-time employees, she was the only one who took advantage of it.  Doc. 20, Ex. G.

Strobles continued in her position as Deputy Town Clerk until April, 2002, when Ms. Weaver retired.  Doc. 20, Ex. C.  Consequently, Richard Powell, a certified public accountant, who has served as the Town's auditor since 1985, conducted a special audit.  Prior to the special audit, Powell discussed with Ms. Weaver "several types of closeout audits which can be completed upon her retirement."  Doc. 24, Attach. 1.  The results of this special audit revealed "no serious irregularities...in the Town financial records."  Doc. 20, Ex. D.  According to Powell, at no time in his "past financial audits...conducted for the Town" had he found any serious irregularities.  *Id*.

During that same time period, Ms. Strobles became one of four candidates to fill Ms. Weaver's position.  Doc. 20, Ex. E.  Strobles  and a white male candidate, Charles Kelley, were invited back for a second interview.  *Id*.; Doc. 1.  At the second interview, which occurred four days later, the Commissioners voted to hire Strobles.  Doc. 20, Ex. F.  Commissioners Aufmuth

---

R. Civ. P. 56.  *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1444 n.35 (11th Cir. 1991); *see also* 28 U.S.C. § 1746.  The "Statement of Undisputed Facts in Support of Plaintiff's Motion for Judgment," Doc. 24, which the Court considers her response to Defendant's motion for summary judgment, is not verified or otherwise signed in accordance with § 1746.  While the Court will consider some of the documents attached to it in setting forth the facts, it cannot consider the Statement itself as a properly filed affidavit.  *Id*. at 1444 n.36.

and Berkowitz and Mayor Pro-tem Baird voted in her favor, while Commissioner Roberts

dissented.  *Id*.

Ms. Strobles' salary was set at $11.00 an hour for a 40-hour week, with a six-month

probationary period.  *Id*.  As the new Town Administrator, Strobles' duties included:

> Responsible for all financial procedures and records of the Town and the Water
> Department;
>
> Responsible for the budget process;
>
> Serves as voting registration deputy and the Commission's representative in
> matters related to municipal elections;
>
> Researches, compiles, and distributes material pertinent to Town and Government
> issues;
>
> Acts as liaison between the Commission and other government agencies; and
>
> Serves as supervisor of all Town employees and makes hiring and firing
> recommendations.

Doc. 20, Ex. B.  She also was expected to have a working knowledge of all Town departments

and to administer any grants received by the Town.  *Id*.

In April, 2002, the Commission hired Jennifer Cialona-Mangione, a white female, to

replace Strobles as Deputy Town Clerk.  Doc. 24, Attach. 4; Doc. 1.  On October 1, 2002, Ms.

Strobles "provided a memo to the Commission regarding an employee attendance on the job."

*Id*.  She advised the Commission that "there's been difficulty completing a 40-hour week during

regular office hours."  *Id*.  Apparently, the referenced employee is Cialona.  There is nothing in

the minutes to indicate that Ms. Strobles requested any action on her memo.  *Id*.

At the December 3, 2002, special called meeting, Ms. Strobles "asked the Commission to

review [Cialona's] Performance Appraisal Form." *Id*.  She then "made a recommendation...for

Ms. Cialona-Mangione to [be] transferred from probationary status to full time." *Id*.  At that

time, however, the Commission voted to extend Cialone's probationary period until April 29,

2003, rather than make her a full-time employee.  *Id*.

On March 11, 2003, Ms. Strobles requested that the Commission set a date "to review the

performance of the Deputy Town Clerk and the Recreation Director."  Doc. 25, Attach. 5.  The

Commission fixed the review date as April 3, 2003.  *Id*.  However, on March 25, 2003, Ms.

Strobles terminated Cialona's employment because of concerns over "tardiness and punctuality."

*Id*.  Ms. Cialona-Mangione resigned before the termination became effective.  *Id*.

Jeanette Brashear, an African-American female, was the hired as Deputy Town Clerk,  to

replace Cialona.  According to Ms. Strobles, Brashear

> was left with a backlog of work because Ms. Cialone-Mangione had not been
> performing her duties.  Strobles then had the responsibility of performing her own
> duties as Town Administrator, training Ms. Brashear, and helping Ms. Brashear
> complete her tasks while she was in training.  Strobles asked Ms. Weaver to help
> with the backlog, but Ms. Weaver declined.

Doc. 1.  Upon her retirement, Ms. Weaver had been given "the opportunity to work as a

consultant for the town in the future."  *Id*.

On May 14, 2003, Commissioner Baird sent Ms. Strobles an e-mail documenting a

meeting the women had to discuss Baird's "concerns about how [Strobles'] school schedule is

affecting your performance."  Doc. 24, Attach. 17.  At the May 20, 2003, Special Called

Meeting, Commissioner Fay Baird "made a motion to add [to] the agenda discussion regarding

the Town Administrator's absence from meetings."  Doc. 20, Ex. H.  The motion failed on a 2-2

vote.  *Id*.  The Minutes show that Ms. Brashear was in attendance, but not Ms. Strobles.  *Id*.;

Doc. 1.

On May 27, 2003, Ms. Strobles sent Commissioner Baird an e-mail regarding their May

14, 2003, meeting

> to verify the following key concepts that you expressed concern regarding
> administration of town hall:
>
> 1)      The necessity for an answering machine/services
> 2)      Complaints you received from neighbors about the Town Administrator
> 3)      Changing the position of Town Admin. from full-time to part-time
> 4)      The lack of supervision for town employees
> 5)      Town Admin. not attending recent Commission meetings
> 6)      Town not running smoothly since the new Administrator was hired.

Doc. 24, Attach. 17.

At the regularly scheduled meeting held on July 8, 2003, Ms. Strobles advised the

Commission that "the June 10 minutes should be ready by July 17."  Doc. 20, Ex. I.

Commissioner Baird "commented for the record that minutes must be ready prior to the next

regularly scheduled meeting.  This consistent problem is not acceptable."  *Id.*  In fact, the

minutes of this meeting were not prepared until April 12, 2004.  *Id.*  This failure timely to

prepare the minutes occurred on other occasions as well.  *See* Doc. 20, Ex. J & K.

On July 8, 2003, the Town's Recreation Director, Everett Brown, an African-American

male, was terminated for good cause, namely, "[n]egligence in the performance of job duties"

and "[f]ailure, incompetence, or unwillingness to perform job duties."  Doc. 20, Ex. L; Doc. 1.

After Brown's termination, Mr. Powell, pursuant to the Commission's request, conducted a

special audit  since Brown "had access to Town funds."  Doc. 20, Ex. D.  The audit covered the

period from October 1, 2002, through June 30, 2003.  *Id.*  Powell had given the Town a "good

report" after the previous year's audit.  Doc. 1.

On July 30, 2003, "based on [his] preliminary determination that cash accountability

controls had deteriorated over the period of review," Powell met with Commissioner Berkowitz and Ms. Strobles to discuss his "initial findings and recommend eight temporary corrective procedures to be implemented immediately." *Id.* The recommendations included:

1.   Water receipts should be entered...as they are received in the office on a "real time basis."

2.   The computer daily collection report should be run at the end of each business day and the cash and check totals should be balanced with the cash drawer.

3.   The water bank deposit should be prepared and should agree with the report total. If not made at that time the deposit should be placed in the safe for next day deposit; or taken to the bank night deposit.

4.   The bank deposits should be recorded in the computer with an appropriate journal entry.

5.   A "one write" receipt should be issued for all other receipts received in the Town office. The separate receipt system should be utilized for this process. The receipt should be given to each payor, or retained in the appropriate revenue file for any mailed receipts. The separate prenumbered receipt book should be discontinued.

6.   Daily...cash received should be balanced with...receipts issued. The cash and checks should be secured in a separate cash drawer for the water receipts.

7.   Daily if possible, and always by the end of each week, bank deposits should be prepared and referenced to the series of receipts received.

8.   As deposits are made, the journal sheets should be classified and totaled and appropriate journal entries should be made in the computer system.

Doc. 20, Ex. M. Powell's recommendations, which were submitted to the mayor, concluded with a note that after the completion of the special procedures, he "may recommend additional or alternative cash control procedures for the Town." *Id.*

According to Ms. Strobles, she was not given sufficient time "to find supporting

documentation relating to the audit," since she had to maintain her daily duties and

responsibilities and train Ms. Brashear, while retrieving "numerous files, checks, [and] ledgers"

requested by the auditor.  Doc. 1.

On the following day, in a special called meeting, the Commissioners authorized a full

audit.  Doc. 20, Ex. N.  The Mayor also advised the Commissioners that he had asked Strobles to

implement Powell's recommendations.  *Id.*  Ms. Strobles was in attendance at this meeting.  *Id.*

On August 28, 2003, Powell completed a "Special Report of Agreed Upon Procedures to

Accounting Records."  Doc. 20, Ex. O.  Basically, Powell's audit revealed "that the Town

finances were not properly maintained."  Doc. 20, Ex. D. More specifically, he found:

"accounting records were substantially incomplete; bank reconciliations had not been completed

for nine months; there was a $482.03 cash shortage in the water department for the month of

April 2003; and other inaccurate and inadequate record-keeping existed."  *Id.*  According to

Powell, "Many of the deficiencies existed in the basic bookkeeping procedures, which are

crucial to maintaining accurate accounting records."  *Id.*  The Report detailed Powell's findings.

In particular, he concluded:

1.      "For the period of our review, there was no formal daily cash drawer balancing
        procedure" for the Water Department;

2.      As to "Other Town receipts," they "were not reconciled to subsequent bank deposits or
        general ledger revenue postings";

3.      "Ms. Strobles was responsible for preparing the monthly bank reconciliations for the
        central pooled cash account.  There was no process in place whereby monthly bank
        reconciliations were reviewed or approved by another employee or [Commissioner]";

4.      The Commission did not exercise oversight over "invoices to be paid prior to checks
        being issued," expenditures invoices, or employee time sheets and accumulated leave
        records;

5.      "[B]ank reconciliations had not been completed on [the pooled cash checking accounting]" for the period of review.  Ms. Strobles advised Powell that the reconciliations had not been completed because she had not yet been trained on the new financial accounting system;

6.      In April, 2003, there was a $482.03 cash shortage relating to "documented water receipts and corresponding bank receipts."  Powell could not determine individual responsibility for this shortage due to "inadequate internal control and custody over cash receipts";

7.      Receipts of $76.11 "could not be traced to corresponding bank deposits or cash on hand";

8.      Inadequate records existed to document that all recreation revenues collected were actually received and deposited;

9.      "The accumulated leave records for Karen Strobles as of June 30, 2003, reflected annual leave of 10 hours and sick leave of 3 hours in excess of the allowable amounts as shown on her monthly time sheets."  The "overstated balances are the apparent result of inconsistent posting of leave earned and taken...."  Powell did not "reconstruct leave transactions for all Town employees [but] did not find any noticeable unusual amounts in leave accumulations for other employees";

10.     "The accumulated compensated time records of Karen Strobles at June 30, 2003, reflected 74.97 hours in excess of that computed from her monthly time sheets.  The accumulated compensated time records of Frank Sanders at June 30, 2003, reflected 1.13 hours (overall) in excess of that computed from his related monthly time sheets."  Strobles advised Powell that the discrepancies "were largely attributable to her belief that compensated time is to be recorded at time and one half rather than straight-time";

11.     Cellular telephone bills reflected $715.88 in excess airtime charges over the monthly allowances for the phone assigned to Ms. Strobles; of this amount, she paid $133.00 for her personal use.  Powell was not provided with any documentation regarding this personal use calculation or the purpose of the remaining $582.58 in overage airtime charges.  For the cell phones assigned to Sanders and the Fire Department, the monthly billings "were within the maximum minutes allowed by the rate plans";

12.     The Town paid $395.68 in travel expenses in excess of amounts allowed by law related to an approved conference attended by Strobles.  It was apparent to Powell that Strobles "likely did not have prior knowledge that expenses for this trip should be paid in accordance with the State of Florida travel regulations."

Doc. 20, Ex. O.

        Powell also reviewed the current status of the temporary corrective procedures,

concluding:

> Although we found that water receipts were generally being made more
> frequently, we found that [the eight] procedures had generally not been
> implemented.  While the separate general purpose receipt book has been
> discontinued, it has been replaced by another prenumbered receipt pad which
> requires separate carbon paper and is actually inferior  to the book it replaced.

*Id*.  He reiterated that the eight procedures should be "implemented...as written."  *Id*.

Powell presented his Report to the Commissioners at a special called meeting on August

28, 2003.  Doc. 20, Ex. P.  Ms. Strobles was in attendance at this meeting.  *Id*.  When asked what

her response to Powell's findings were, she replied:

> I inherited a system that was already in place.  And previously, there was a lot of
> confidence that were given to previous employees, and previous employees knew,
> and to handle the day-to-day operations and collected the things that were needed
> and forward them to where they needed to go.
>
> There has been documentation that was provided to the Commission before when
> there was concern that previous employees were not fulfilling their job.
>
> The Commission was also informed that there were times on several occasions
> where I had to, in addition to my daily duties, also fulfill those of other people;
> and unfortunately, had to bring other people in, to try to keep the mainstream of
> Town operations continuing.
>
> So, it's a really unfortunate, hard to say who might have been responsible for the
> amount that's not–you know, hasn't been recorded.
>
> * * *
>
> Something that [Powell] was not aware of, something that I started doing, is tie in
> invoices that were over a certain amount, to also have those at the Commission
> meeting, just in case if there were questions, that those particular invoices, you
> know, would be there.
>
> And it is common practice, and has been, that every check that is issued, that the
> invoice is there as back-up in explanation of what is was for.
>
> And also, in addition to the Fire Department, because their invoices aren't as

clear, the Fire Chief also started writing the Fire Chief's  Approved first, prior tothe purchase, and they also write what that is about, so it would be clear to whomever the Commissioner that signs those.

\* \* \*

There are not some things, unfortunately, not stated in the manual.  But as far as clarity, so everyone would understand, and we could agree that some things may need to be included.  And one of this is on comp time.

Because you have two people outside working; both receive a wage.  One person can have their comp time accumulate and won't have to take that within a timely manner.  But the other person receives time and a half.  Where apparently our auditor interpreted as only the salaried person receiving it as straight time.

For one of the other–for Mr. Sanders, his time may not be–his time was also computed as the same as mine, as time and a half.  And I initialed , you know, his.

So, if there's going to be some change to that, it surely needs to be clarified in our policy manual, along with some other areas, also.

\* \* \*

To clarify, since some people are not–unaware.

Any time there's been any invoice...I was always available, if you had any question about it or you needed to find out why we spent this much, and why we spent that much.

*Id*.

During the course of the meeting, Commissioner Roberts was the first to broach the subject of "replacing Ms. Strobles."  *Id*.  Commissioner Baird also expressed her concern "that there are some things just not being done" and offered several options for resolving the issue, including (1) suspending Ms. Strobles for five days while the Commission considered "what should happen next," (2) calling for Ms. Strobles' immediate resignation, and (3) conducting an individual review.  *Id*.  She then made a motion to request Ms. Strobles' immediate resignation.

*Id*.  Baird explained that Ms. Strobles "would not have gotten this job, if the four people who were sitting here who reviewed all of the applications, who conducted the interviews...had not had confidence in her," but that she did not "think we would be doing Karen any favors by dragging out this situation."  *Id*.

Commissioners Roberts and Berkowitz acknowledged that the Commission itself must "share the blame here," Berkowitz expressing his belief that "[p]erhaps we've expected too much out of Karen.  It overwhelmed her."  *Id*.  The motion to request Ms. Strobles' resignation did not carry; instead, the Commission voted to "have a special-called meeting...to consider the audit report, the items in the report, and the performance review of Administrator Strobles."  *Id*.

Ms. Strobles concluded the meeting with the following statement:

The statement regarding invoices, they were always documented with the invoices.  Whether approved–whichever Commissioner signed the or not, they were always there; so you saw what was being signed and where it was going.

And as far as adequate training, there has not been any.  There have been attempts for the person that we contracted to get that.

So, I do believe for the amount of training that I had, versus the class that I had, I did rather well.

I am not–I cannot be held accountable for people's other actions for a position that did not fulfill their role.  Some of those persons are no longer with us.

There's documentation where there was a concern of that, that was brought up to the Commission.

*Id*.

Five days later, on September 3, 2003, another special-called meeting was held to "allow the Town Administrator to respond to the serious questions raised in the recent Audit Report."  Doc. 20, Ex. Q.  In opening the meeting, the Mayor noted that Ms. Strobles had been given

notice that this was "her opportunity to respond to the Audit Report" and that "because of the serious nature of the matters raised in the Audit Report, the Town Commission maintains its right to take appropriate disciplinary action." *Id.*

Ms. Strobles responded:

At this time I am in a bind...because of what the Commission did six months ago.[3]

Also, I asked the former Town Administrator to come in and consult to help train our new Deputy Town Clerk who was unknowledgeable about our town practices, because she was going to do the consultation that was previously approved by the Commission, if we needed her.

When I asked the former Town Administrator, I was told that, "I'm unable to do that and I did not want to get involved."

The Commission expressed concerns about being over-budget.

The Audit Report  showed we spent over the budget amount for repair of the fire truck, the town truck....And other items have been noted in the workshop budget that the Commission has had.

At this time I feel uncomfortable in answering any other questions due to that I do not have legal counsel present.

* * *

I would also like to add–

* * *

–that I have been badgered about turning in my letter of resignation.

That has had–added extra stress, not only to me, but also to my family.

And regardless of what the decision the Commission makes tonight, history cannot be changed.

Karen Strobles was the first African-American Deputy Town Clerk of Micanopy;

---

[3]Plaintiff does not explain this remark.

and also, the first African-American Town Administrator.

And I would like that to be duly noted for the record.

*Id*.

The Commission opened the floor to public comment and questions, and it was then that the subject of race was interjected into the discussion. *Id*. In response, Commissioner Berkowitz explained that he did not think there was "any race involved whatsoever here" and that the purpose of the audit was not "to try and put Karen down or anything like that." *Id*. Instead, "We had an audit because we had terminated our Recreation Director; and since he handled funds, it was appropriate to have him in the audit. And when those results came back, enough questions were raised to prompt us to have a full audit." *Id*. He also explained that it was not the amount of disputed funds that concerned him, but rather, "the management of everything that we had here." *Id*. In his opinion, if Strobles "felt she wasn't getting the proper training," she should have "let us know, to come to us, and jump up and down on our heads, if we needed it." *Id*.

Ms. Strobles disputed Commissioner Samarrai's statement that the Town "has had many audits" and pressed her belief that the Commission had been hasty in its judgment. *Id*. Strobles also stated that there were items in the audit which were untrue, specifically, the amount of missing funds. *Id*. While the Mayor acknowledged that as the process continued, the amount of funds which were unaccounted for had "been going down," he was concerned mostly with what had not changed, i.e., the procedures and "and things that were happening in the office to result in having to have an audit in order to go through and find these things." *Id*.

Powell's Report was approved, and the Commission then discussed appropriate corrective action, given its possible exposure to liability for "allowing the unacceptable

condition or procedures to continue...." *Id*. In response to Commissioner Samarrai's question, "Do you want your job," Ms. Strobles' aunt stated: "Yes, Karen does want her job. She has been in contact with a person about [training]. But because we do not have legal representation tonight, we can't respond further than that." *Id*. Commissioner Samarrai then made a motion to terminate Ms. Strobles, which was seconded. *Id*. Even when Samarrai told Ms. Strobles that he would vote against his own motion if she would "please say something," it was Ms Strobles' aunt who responded instead, and then she and Ms. Strobles pressed for a vote without further discussion. *Id*. The vote proceeded, with only the Mayor voting against Ms. Strobles' termination. *Id*. In determining its next step, the Commission asked Ms. Brashear if she would be willing to act as interim town clerk if necessary. *Id*. She declined based on her lack of experience. *Id*. The Commission then voted to appoint Charles Kelley, the Code Enforcement Officer, as interim town clerk. *Id*.

In a follow-up letter to Strobles, the Mayor explained that she was dismissed as Town Clerk "based on your failure to carry out your job duties as listed at Section 3.1 of the Town of Micanopy Policy and Procedure Manual. This failure...is well documented as being a longstanding problem in the 'Town of Micanopy, Florida, Special Report of Agreed Upon Procedures to Accounting Records, for the Period October 1, 2002-June 20, 2003.'" Doc. 20, Ex. R.

In her charge of discrimination, Strobles stated:

During the course of my employment, I was subjected to different terms and conditions because of my race (black) and sex (female). After having problems with the new Deputy Town Clerk, Jennifer Cialona-Mangione (white), I recommended termination of her employment. Ms. Cialona-Mangione resigned on March 27, 2003. Two months after Ms. Cialona-Mangione resigned, I was

audited.  No other employee (white) in the past was ever audited in the middle of [the] year.  I was questioned about the use of company credit cards and travel although I was approved by the commissioners to use them.  On September 3, 2003, I was terminated.  I was told that I was terminated for lack of job performance although I had an outstanding evaluation 6 months ago.  After my termination, I found out Charles Kelly (white male) replaced me.

Doc. 1, Ex. A.

## DISCUSSION

On a motion for summary judgment, the Court must ascertain whether there is a genuine issue of material fact.  Fed. R. Civ. P. 56(c).  This requires the Court to evaluate "whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 250 (1986).  The United States Supreme Court has stated that "this standard mirrors the standard for a directed verdict...which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.  If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed."  *Anderson*, 477 U.S. at 250-51 (citation omitted).[4]  Further, the Court has noted that the "genuine issue" summary judgment standard is very similar to the "reasonable jury" directed verdict standard, the primary difference between the two being procedural, not substantive.  *Id*. at 251.  "In essence...the inquiry under each is the same:  whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id*. at 251-52.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;

[4]While the terminology has changed, a motion for directed verdict having been replaced with the motion for judgment as a matter of law, the standard has not.  Fed. R. Civ. P. 50.

there must be evidence on which the jury could reasonably find for the plaintiff.  The judge's

inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of

the evidence that the plaintiff is entitled to a verdict - 'whether there is [evidence] upon which a

jury can properly proceed to find a verdict for the party producing it, upon whom the onus of

proof is imposed.'"  *Id*. at 252 (citation omitted).  However, "[c]redibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a

directed verdict.  The evidence of the nonmovant is to be believed, and all justifiable inferences

are to be drawn in his favor."  *Id*. at 255.

   In an employment discrimination case where there is no direct evidence of

discrimination, either racial or sexual, the Court looks to the shifting burdens of *McDonnell*

*Douglas* for guidance.  *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  Defendant concedes

that Plaintiff can establish a prima facie case of discrimination, Doc. 19, and thus, the burden of

production, but not of persuasion, falls on Defendant to articulate a legitimate, nondiscriminatory

reason for its termination of Plaintiff's employment.  *Wilson v. B/E Aerospace, Inc*., 376 F.3d

1079, 1087 (11th Cir. 2004).  If Defendant satisfies this burden, then the burden of

production–and of persuasion–returns to Plaintiff "to offer evidence that the alleged reason of

the employer is a pretext for illegal discrimination."  *Id*.

   If Defendant's proffered reason "is one that might motivate a reasonable employer, a

plaintiff cannot recast the reason but must meet it head on and rebut it."  *Id*. at 1088.

"Quarreling with that reason is not sufficient."  *Id*.  Because the ultimate burden of persuasion

lies with Plaintiff, she may prevail "by either proving that intentional discrimination motivated

the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination." *Id*.  However, Plaintiff's personal belief that she was discriminated against, without any supporting evidence, is insufficient to establish pretext. *Mosley v. MeriStar Management Co.*, 137 Fed. Appx. 248, 251 (11th Cir. 2005).

It must be remembered that this Court does not sit as a "super personnel department that second-guesses employers' business judgments."  *Lee v. GTE Florida, Inc*., 226 F.3d 1249, 1253 (11th Cir. 2000) (citation omitted).  Therefore, it is insufficient for Plaintiff to show the Court merely that Defendant made a mistake or an unwise decision in terminating her employment.  *Id*. at 1254.

In this case, Defendant indisputably articulated a legitimate, non-discriminatory reason for terminating Plaintiff's employment, i.e., that she failed to carry out her job duties as stated in the Town's Policy and Procedural Manual, particularly her financial responsibilities to the Town.  The burden therefore shifts to Plaintiff to raise a genuine issue of material fact that this reason was a mere pretext for racial or sexual discrimination.  Plaintiff has wholly failed in that regard.  At best, she has shown (1) that at least one of the Commissioners, Ms. Baird, was, for lack of a better phrase, "breathing down her neck," and (2) that Plaintiff and some members of the community subjectively believed that race was a factor in the Commission's "hasty judgment" to hold Plaintiff solely accountable for the Town's financial woes.  However, neither of these is sufficient, without some real proof of discrimination, to survive summary dismissal of this action.  In short, this Court does not believe that Plaintiff has offered any proof to dispel Defendant's articulated reason for her discharge and certainly no "evidence on which the jury

could reasonably find" for her in this case.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant's motion for summary judgment, Doc. 19, be **GRANTED**, and this cause be **DISMISSED WITH PREJUDICE**.

**IN CHAMBERS** at Gainesville, Florida, this   2nd     day of July, 2007.


s/A. Kornblum
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**